We're here on case number 17-50762. You all are as well aware as we are of the traffic rules, so we will appreciate your adhering to our time limit, although you've got extra time to begin with. And the first person up is going to be General Keller for the State of Texas. May it please the Court, SB-4 is wholly valid. I apologize, Solicitor General Keller. General Paxson is in the courtroom also, my mistake. Neither one in a uniform with stars on it. May it please the Court, SB-4 is wholly valid. As the State panel correctly concluded, there is no Fourth Amendment violation or federal preemption. And on the facial vagueness and free speech claims, we have offered dictionary definitions of materially limit and endorse, which are reasonable and thus must be accepted. Nor are any of the cross-appeal claims successful. I'll start with the ICE detainer Fourth Amendment and preemption issue. As the State panel correctly concluded, there's no question that federal officials can reasonably detain for civil immigration violations. And District Court erred by finding that there's a different probable cause predicate for state officials versus federal officials. States, like the federal government, can detain for civil offenses. And here under the collective knowledge doctrine, when the federal government is making an express request to the state to detain for 48 hours additionally, when the federal government is telling us that they have probable cause to believe that an alien is removable, local officials can legitimately rely upon that and the knowledge from the federal government is imputed to the state. Turning from the ICE detainer Fourth Amendment issue to the preemption issue, this is not preempted, as the State panel concluded, under 1357G10B. That savings clause, as Arizona versus the United States recognized, allows states to cooperate and assist with federal immigration officials. And we don't need a formal 1357G agreement to do so. If localities themselves want to function as de facto federal immigration officers, they can enter into that formal agreement with the federal government. But G10B expressly says they don't need that formal agreement to cooperate with federal immigration officials. When you say cooperate, does that include self-initiated action or only action that's in response to some sort of request? It would be action, the latter, action that is first prompted by a federal government request. And we know that from the statutory language, that it's cooperation with a federal immigration official. So Section B.3 only is triggered when there's a predicate request. Now that is different, though, than, say, the B.1 duty. Well, I mean, just thinking of a simple analogy. If a bunch of firefighters are fighting a fire and I come up with a hose and start putting the hose on the fire, in a sense I'm cooperating with them, but they haven't asked me to help them. So I'm just trying to draw that distinction. In the construction that we have offered, based on assisting or cooperating with a federal immigration official, we can see that that language in B.3, the with predicate, it has to be done in conjunction with. And the idea of SB.4 to back up is it was prohibiting sanctuary city policies, so that makes sense not only from a textual matter but also within context. But I do want to be clear, that's different than the B.1 separate duty that the district court did not issue a preliminary injunction on, in that SB.4 does say that you can't have policies that block immigration status inquiries. Now an immigration status inquiry, a mere question, that could be unilateral action. But then we're not talking about cooperation under B.3, we're talking about the B.1 immigration status inquiry, or the B.2 information sharing duty. And again, B.3 is subject to the appeal, B.1 and B.2 are subject to the cross appeal. Regardless, none of these provisions are preempted. Arizona versus the United States found preempted two provisions that were penalties imposed upon aliens, and also a provision that involved unilateral arrest power that the state was trying to do based only on federal civil immigration offenses. We don't have any of that here. Rather, what this law is, is the state of Texas is regulating its own local officials. So we do not have penalties that are being imposed on aliens. And in addition to that, Arizona expressly upheld a very similar requirement about requiring immigration status inquiries. And so what Congress was doing there, as Arizona said, was it was encouraging cooperation and encouraging states to share information. And in that situation, which is exactly what we have here, is wholly valid for the state to direct its localities and its laws and its use of state sovereign authority to direct its own localities and its agents as to how to exercise the state police power that has been delegated to it. If I can turn from the Fourth Amendment and preemption issues in address, in particular, materially limited in the vagueness issue. The court's precedent, based on longstanding Supreme Court precedent, is a facial vagueness claim only can succeed if the law simply has no core. Well, here, plaintiffs have conceded that various policies that they have would, in fact, be prohibited by SB 4. That concession alone means a facial vagueness claim cannot stand. And the plaintiffs have ignored this court's precedent, this court's unbanked precedent, Gonzalo's Longoria, from last term, which echoed and quoted that longstanding Supreme Court opinion. Turning from the materially limited facial vagueness issue now to endorse in the free speech claim, we have offered a reasonable construction of the term endorsed. And that dictionary definition, because it's reasonable, must be accepted under skilling. To endorse in this context means to sanction, to ratify, to confirm. Well, why didn't they say that? I mean, it is kind of an unusual word. It's very curious to use the word endorse. And Judge Smith, what we admit, endorse in certain contexts could refer to political speech, it could refer to speech. But in this context, first of all, given that we have offered that reasonable dictionary definition, and in the context of the law talking about uses of government power, read alongside adopt and enforce, this is a reasonable construction of that. What the legislature was aiming for was not allowing a loophole where you have a policy that wasn't formally ratified and had not yet been enforced with penalties yet, but had been tacitly adopted. Well, that would cover practice, wouldn't it? It would also go to practice. Let me ask you about a complaint for declaratory judgment filed in Austin by the Attorney General. And I think it's one of the defendants, Travis County Judge Sarah Eckhart, quote, publicly endorsed Travis County's policy and practice. And then there's a quotation from Judge Eckhart, and it's attributed to the newspaper. Now, is that, you say that's an endorsement where she's talking, she's giving her legal opinion about they're not being caused to detain under the Fourth Amendment or something like that, and the state characterizes that as endorsed. So you think she should be thrown out of her position for that? Judge Jones, under the reasonable construction we have given, endorsement would have to be a use of government power to sanction or ratify a policy. All we're talking about would be a public statement or political speech. Let me get this now. Endorse. A use of what? It would be to sanction, ratify, or to confirm. And this is in our brief at pages 42 to 46. Right. But it's public authority, right? That's correct. For instance, let's say an official were to say that they disagreed with the policies underlying SB4. That would not be sanctioning or ratifying a government policy that the locality has. And under the reasonable dictionary definition that we have offered, that is a narrowing construction that must be accepted. Again, we admit endorsement in other contexts could cover various forms of political speech. But when presented with a reasonable construction to save the statute, every attempt must be made to do so. And that's why we have offered that today. Isn't that less prevalent, the narrowing construction idea in First Amendment cases? Even then, the Court has said, especially in the context of an overbreadth challenge, that courts are not to go out of their way to pick the most capacious definition. But rather, if there's a reasonable construction offered, you would then look at, well, under that reasonable construction, are there then overbreadth concerns there? But given that this would be sanctioning or confirming or ratifying a government policy, that would not sweep in any protected speech. Because we know from Garcetti v. Tobias that when a government official is speaking as a government officer, different free speech doctrine. But can that apply to an elected officer as well? I mean, Garcetti's a public employee, and I believe an elected official, like a sheriff or a county judge or something, certainly have more latitude to speak, don't they? Well, they would have latitude to speak as a candidate and as a private citizen. Of course, government officials always have that right when they are acting as private citizens. Suppose Judge Eckhardt went to the state legislature to comment to endorse doing away with SB 4. Would she be violating this law? No, because she would not be endorsing under the reasonable construction that we have offered. I understand that. Does it have a chilling effect of some sort on officials as to how they can talk when they're interviewed in the evening news and they might be asked questions? Wouldn't they be hesitant how to speak up in a situation like this for fear that they might be run out of office for what they've said on the evening news? No, Judge Prado, because the construction that we have offered would only apply to a use of government power. An official going and giving a newspaper interview or a press conference where they would disagree with the policy judgment under SB 4 would not be sanctioning or confirming a local policy to ignore the mandates of SB 4. And that is a clear line that can be drawn between a use of government power versus simply speaking as a private citizen. Well, what about the argument that when the person at the top, I mean, I know this is your narrowing construction, but in fact it may be too cute by half because when the person at the top of the electoral totem pole says this is a god-awful policy, it's bad for immigrants, it's bad for the state of Texas, that may not be sanctioning, ratifying, or confirming a policy, but it does send a message to the people below, doesn't it? Well, to be very clear though, if this were a pretext that... How are you going to prove pretext in this? I think the answer would be to look at the court's precedence even in Section 1983 pattern of practice or for textual claims. Courts do draw the lines between when is something moving from... Well, we don't normally, I mean, I don't think we normally do that when we're balancing, when we're looking at First Amendment issues, and particularly this is core political speech. If the court were to reject our reasonable construction and it would not be limited to the use of government power, then it would sweep in political speech. But what we're offering is a dictionary definition that is limited to the use of government power that is actually confirming a policy, that would be a valid construction. I mean, another alternative is just to say that it's very difficult to disentangle in force from legitimate public speech, and therefore we're just using the separability clause and it comes out of the statute. That's right. If the term indoors were invalid, the remedy would be as the State Panel recognizes... In fact, I can turn very briefly to a couple of the cross-appeal issues. Section B-1, the status inquiry provision, Arizona upheld a stricter law. That law required immigration inquiries, and even there the Arizona law contemplated interactions between officers and potential detainees in the very same way that SB 4 does. Also, crucially on that point, if a stop is not prolonged, there is no Fourth Amendment violation, there is no arrest, so there cannot be any preemption under Arizona. And mere questioning is not a seizure. That's Boston. Regardless, SB 4 would only apply and B-1 would only apply there when an alien is already under a lawful detention, so there's no threat of an ongoing stop being prolonged. And then turning from B-1, the status inquiry provision, to B-2, the information sharing provision, that was what was upheld in Arizona. Arizona also had a law that there actually required communication between the state and the federal government, and Arizona crucially had its own state law penalties, and the United States expressly raised that to the Supreme Court, and the Supreme Court upheld that requirement. So we know from Arizona and from Whiting that a state can have additional penalties beyond what federal law has, and those are still valid. The issue is, and it comes back to, is this something Congress has encouraged? If you have a policeman that stops somebody for a traffic violation and in giving them their speeding ticket or whatever, discovers that the person might be in the country illegally, is there some responsibility for the local policeman to do something about that or just simply give them their traffic ticket and let them go on their way? What SB 4 would say is localities cannot have policies that would block, prohibit, or materially limit an officer from engaging and helping immigration enforcement. Now, they can't unilaterally arrest the person beyond what they could otherwise do, but merely asking a question is not a seizure, and so there would be no Fourth Amendment issue, there would be no unilateral arrest from that. So if he discovers the person's in the country illegally, does he take them into jail and call Homeland Security, or does he let them go on his way? The state official or local official would not be able to unilaterally arrest, and Judge Jones, I see my time has expired, if I can answer the question. Go ahead. What would happen in that scenario is SB 4 would say you can't have local policies that block the officer from either questioning or from relaying that information to the federal government, and that's exactly what Arizona upheld. But the determination of whether the alien was actually removable and whether the alien should be detained solely for federal immigration purposes, that is left up to the federal government, which is precisely why this law is not preempted. I'm looking at, I'm trying to find the provision that's an exception to the cooperation if the alien, the person, produces proof of citizenship, and among other things, it says driver's license. Oh, there it goes, Texas driver's license. Are Texas driver's licenses, I'm sorry, awarded to people who are not legally present in the United States? Texas driver's licenses are issued to recipients of deferred action, and the state of Texas position is that deferred action does not confer lawful presence. However, we have to rely on the federal government's determination of that. So when the federal government tells us that deferred action is lawful presence, for purposes of driver's licenses, we rely on that. But otherwise you're saying the only way a person would have a TDL who was not legally present would be basically if they lied? Essentially. Or misrepresented? Yes, without having cataloged all the possibilities there. Right. We wouldn't want to make a categorical statement, but generally, yes. Okay, all right, I wanted to understand that. Okay. Thank you. All right, Mr. Stewart. Thank you, Your Honor. May it please the Court. I'm Scott Stewart on behalf of the United States. In Arizona v. United States, the Supreme Court recognized that state officials can cooperate with federal efforts to enforce the immigration laws. SP4's detainer provision and its enforcement assistance provision, that's Texas Code of Criminal Procedure Article 2.251 and Texas Government Code 752.053b3, both involve the sort of lawful cooperation that the Supreme Court recognized. I'm happy to answer any and all of the Court's questions, Your Honor. I think the United States is happy to rest on its briefs as much as it can. I will emphasize perhaps just a few points. One is we try to As long as you've taken ten minutes, you better say something. Of course, Your Honor. The point I'd like to emphasize is that this is a facial challenge. Therefore, to prevail on this claim, the plaintiffs must show that these provisions are invalid in all of their applications. They can't do that. The reason the district court concluded that this facial challenge was able to succeed on the detainer provision in particular was that the detainer provision requires local officers, and I'm quoting from ROA 4194 to 4195. It requires, quote, to effect seizures requested by ICE while prohibiting those officials from making an independent particularized assessment of whether probable cause exists to support that seizure, end quote. As we've explained, that premise is wrong. An arresting officer does not himself or herself need to know the facts that establish probable cause or need to determine those facts for him or herself. They can rely on the knowledge of other law enforcement officers, and here in each of these cases in which an ICE detainer is issued, a federal ICE officer with knowledge of relevant facts and relevant law is making those determinations. The government, as I recall it, that is to say the state, placed some emphasis on this Form I-247A, Immigration Detainer Form. It looks a lot like a warrant, a civil warrant, but the challengers suggest that this I-247A may not always or even often be the basis for seeking cooperation with the local authorities. What's the answer to that? The answer there, Your Honor, is that even if they're at the margins, perhaps some cases where the I-247 isn't always at work, say like those cases where there's maybe a phone call or something like that, the vast majority of the applications that are involved here are a situation where under ICE policy somebody is already in a locality's custody and a detainer along with an administrative warrant is issued regarding that person in custody. So the run-up cases, more than enough cases to satisfy a facial challenge, Your Honor, are a sort of detainer paradigm where there is a detainer and a warrant. Am I correct that there apparently was not a challenge to the provision, and I forget whether it's B-3, that says that the local authorities have to allow the ICE officers admission to jails or holding cells or whatever? Maybe, I mean, at most, yeah. I can't recall that specifically, Your Honor. That's often done as sort of a permissible form of cooperation in response to a federal request. C-4, permitting a federal immigration officer to enter and conduct enforcement activities at a jail to enforce federal immigration law. I didn't see a challenge to that unless it's just swept in under the general preemption scheme. I don't think the issue has been joined very much in this. We haven't. The United States hasn't kind of addressed that in sort of a direct way. Sometimes that sort of cooperation is the sort of thing that DHS contemplates that a state or a locality may permit. Well, I know from reading the headlines that California passed a law that says they can't do it, if I'm not mistaken, but that's its headlines. Yes, Your Honor, understood. One other point that I'd like to emphasize, Your Honor, is that there's a good amount of discussion in the briefs about formal agreements under Section 287 or 8 U.S.C. 1357, formal agreements versus informal cooperation. I'd just like to emphasize that the detainer provision, the enforcement assistant provision, falls well within the scope of just permissible informal cooperation that doesn't require a formal 287G agreement. A formal agreement is the sort of thing that's needed if you're going to essentially have state officials acting as federal immigration officers, you know, like unilaterally acting, making field arrests and on-the-fly kind of status determinations on their own without a predicate federal request. Here, as Texas notes on page 29 of its opening brief, these provisions are triggered. The ones we're focusing on are triggered by a predicate federal request, and therefore fall in the scope of permissible cooperation, the kind of thing that does not present a preemption problem under Arizona. In addition to that, Your Honor, if the Court has no more questions, I'd be glad to. I guess, is a local sheriff, people are arrested on crimes, and they're there in the jail, you take their vital statistics, and in taking down information, the local jailer realizes this person, there's a good possibility this person might be here illegally. Is he, under this law, obligated to call Homeland Security and say, look, we've got some people here in the jail, they're getting out in bond in a day or two, we think they might be illegal aliens, or does he have an obligation to make that call, to bring it to the attention of Homeland Security? Your Honor, I can't summon to mind a circumstance, at least under anything the United States has addressed here. The pieces the United States has been addressing in particular are the ones of predicate federal requests. Yeah, that might have been a question. But I do know that we know from Arizona that there could be, the state could require some kind of status determination check or some sort of check-in with the federal government in certain circumstances, but we haven't sort of addressed that piece here. Okay. Much has been made, as you pointed out, about the Fourth Amendment. What is the standing of cities to argue Fourth Amendment violations here? I, you know, I'm not, we haven't addressed it, Your Honor, but my understanding is that there's a concern about city officials or cities with policies that could be swept within the ambit of Senate Bill 4 that could in turn cause them harm. The United States hasn't joined. Well, normally a Fourth Amendment claim, a right against illegal unconstitutional search and seizure is a personal claim, and you're not supposed to raise it on behalf of third, of other parties, even another person in a car, you know. So I just wondered how a city is taking on the mantle of the Fourth, how the city A, has a right under the Fourth Amendment, and B, how it's being harmed by a policy that applies only to certain people inside the country. Right, and I'll respect my friends on the other side of the bench's ability  but my understanding is that it's something that goes back to just their obligations and just resulting sanctions that could come with compliance with the law without sort of endorsing that one way or another or taking a position on standing. All right. I'll say that much. Are there no further questions? No. Thank you, Your Honor. Okay, thank you. Okay, we'll hear next from Ms. Perales. Good afternoon. Mr. Valernt and I will divide time and address separate arguments on preemption and detainers. I will also provide argument on the First Amendment, and Mr. Valernt will address vagueness. May it please the Court. I'd like to address two things quickly that were raised by Solicitor General Keller in his characterization of SB 4. He mentioned that it's aimed at local governments, but in fact the definition of local entity under the statute includes individual employees, anybody who receives a paycheck from a city, a county, or a community college district. It's much broader than the governing body, which is also part of the definition of local entity. And second, Solicitor General Keller talked a lot about policies, but SB 4 also reaches practices, as Your Honor pointed out. And so the compulsion under threat of very serious financial sanctions for individual local employees is to enforce immigration law. And the sanctions are greater for elected officials because they include removal from office, and finally greatest for sheriffs and other jail officials. Well, who's going to fire these individual employees who you say are being, you know, intimidated? Because the law only applies to the Attorney General filing a civil action, and I doubt that he's going to reach down to the jailer on C Block in the Harris County Jail in order to fire that person. Well, the firing provision, Your Honor, is removal from office for elected officials. Okay. The individual employees, it's those fines, $1,000 to $1,500 per the first offense, and then $25,000, $25,500 for each subsequent offense. Any individual local employee, whether it's a city attorney, whether it's a district court judge in a courthouse, who as recently as a few months ago in San Antonio, for example, discussed publicly issues of ice-making apprehensions in the courthouse and its effect on women seeking orders of protection for domestic violence, it can reach the community college professor who wants to conduct a debate in a classroom regarding immigration enforcement. Individuals... How can it possibly reach a university professor? A community college professor, Your Honor, is a local entity under SB 4 because it covers cities, counties, and special districts. There are approximately 50 special districts in Texas that are the community colleges, and so it reaches community college employees as well. And so with those clarifications, I'd like to begin with preemption. SB 4's enforcement obligations conflict with a federal structure that already controls how and when local actors participate in immigration enforcement. We have an existing federal structure here that's quite comprehensive in 8 U.S.C. 1357. Federal law, as the Supreme Court said in Arizona, specifies limited circumstances in which state officers may perform an immigration officer's functions. Those occur sometimes under statute. There are a handful of statutes that authorize local officers to go out and make an arrest, for example, under a mass influx or with a felony illegal reentry. But largely, the structure contemplates immigration enforcement at the local level through what's known as a local written agreement under 1357G. It's written. It specifies the officers. It provides training and, of course, always federal control and oversight. Your view is that that's exclusive? It's controlling both from a field preemption perspective, Your Honor, but also with respect to conflict preemption. SB 4, through its very heavy penalties, compels local employees to enforce immigration law. That is 752.053A1 and A2. There is no specification to have within the bounds of a 1357G agreement. There's not even a specification for local, for federal oversight, federal training, or federal control. It simply says that an individual employee must have a practice of enforcing immigration law. And it's not more defined than that. And so as to Judge Bravo's question, whether the individual police officer will feel compelled to make an arrest of an individual because that's enforcing federal immigration law, the pressure will be on, Your Honor, on that individual police officer because if somebody else reports that he has a practice of not doing it, he's the kind of local entity who can be fined under SB 4. So before SB 4, those actions could have been taken, even though they wouldn't be coerced or compelled by state law, right? They could have been taken, and I think they would have raised similar issues of preemption and possibly issues under the Fourth Amendment. But SB 4 now itself is preemptive because it steps in and compels activities that the federal framework has said largely should occur under a written agreement with federal training and federal supervision. Well, just to take Judge Prado gave a couple of examples about the officer who makes a traffic stop and then has a suspicion of possibly that someone is not lawfully in the country. Before SB 4, you're saying that there would have been a problem with that officer calling up some ICE officials or other federal officials and telling them what he saw or what he suspected? No, Your Honor. The calling up there would be consistent and congruent with 8 U.S.C. 1373, which involves an exchange of information. So that's not preempted? That's correct, Your Honor. The provision may be in SB 4. It is preempted for a very special reason, because of the penalties that are associated with it. And a conflict preemption because there is already a federal statute that talks about information exchange. Why wasn't that kind of provision overruled in the Arizona case then? Section 2B in Arizona v. U.S. is different, Your Honor, we assert, from the inquiry provision under SB 4. So going to the inquiry provision as opposed to the information exchange provision because those are B1 and B2 respectively. On inquiry, the SB 4 provision looks more like an interrogation, which is a function of a federal officer asking about immigration status. Well, excuse me, but I quote from the Arizona decision, which says, Section 2B requires state officers to make a, quote, reasonable attempt to determine the immigration status, close quote, of any person they stop, detain, or arrest on some other legitimate basis if reasonable suspicion exists. Well, how are you going to do that if you're not going to interrogate, which you say is the gist of this B2? Your Honor, the U.S. Supreme Court interpreted Section 2B as primarily involving contacting the Department of Homeland Security and exchanging information. It's less than crystal clear whether that means taking somebody's driver's license or other proffered ID and going back to the police car and making that inquiry to the federal government, or that is the way that we've understood Arizona v. U.S. with respect to inquiries, is that the court really read it down to information exchange and that SB 4 opens up a much broader category of asking and asking follow-up questions and then doing unspecified activities in response. If I could address... Before you go there, how would you respond? You say that it's preempt or there's a conflict, but we just heard from Mr. Stewart from the Department of Justice that says it's not, and they seem to want this cooperation from the locals. So how do you respond to the government saying it's not and we want their help and cooperation? The preemption is created by Congress, Your Honor, and by the statute itself. And both Texas and the United States acknowledge all of the structure around 8 U.S.C. 1357G, but say that there's a big exception, and that's G10B. But for my friends on this side of the room, the exception swallows the entire rule. G10B cannot mean that local individual employees can do every activity that is required to be under written agreement with training and certification. No, they can't make the ultimate decision of deportability, and they can't arrest, right? Yes, Your Honor. Well, I mean, those are the critical things that a 10B agreement deputizes local officers to perform. And again, the Arizona case is very clear that you can have routine cooperation between local entities and the government, and in Arizona they mandate the inquiries. The DHS guidance, Your Honor, is very instructive here because it talks about cooperative activities that are not immigration enforcement activities as described in 1357G. And, of course, this provision we're talking about, G10B, starts with the word otherwise, and that's an important word because it's talking about additional things. And the DHS guidance talks about operational assistance, such as setting up a perimeter, participating on a task force, providing facilities. And so, yes, there is a contemplation of cooperation, Your Honor, certainly, in G10B, but it is not as broad or as expansive to permit this very wide truck of SB4's enforcement provisions to drive through. You mean you can't fire people? Is that your bottom line? That SB4 cannot compel enforcement of federal immigration law outside of an agreement under 1357G. And precisely what is it that makes it broader than the Arizona case? Exactly what is a local entity, however described, going to be doing that makes it different from the Arizona case? SB4's structure is helpful. 752.053 has different provisions underneath it, some things that are A and some things that are B. And inquiries and information exchange are addressed specifically as examples. But 752.053A1 and A2 speak broadly about requiring enforcement of immigration law beyond what Your Honor has pointed out as inquiries and information exchange. And this wide-open enforcement compulsion is preempted. Finally, Your Honor, with respect to preemption, even if many of these activities are permitted, Your Honor, for example, making arrests alongside, which we do not say are permissible, there is an insertion of SB4, of obligations and penalties, into the relationship between local actors and federal actors. Local police and ICE officers on the ground on an everyday basis are communicating. And it's the federal government that talks with local officers and decides when and how and where and under what circumstances even G10B cooperation occurs. SB4 inserts itself into this relationship in a way that is not permissible and is conflict preempted. And I would point the Court to cases like Buckman and Lofton, which even though they are in a different context, talk about how disruptive the effect can be of a state inserting itself into an existing relationship in which there is communication and feedback and in which the federal agency decides what is sufficient and what is not sufficient. I'd like to spend my remaining minute, Your Honor, talking about one specific piece of detainers. Let me, we'll give you a bit of extra time if you need it, but I want to say you are not anymore arguing that most of this law is field preempted. Is that correct? No, Your Honor. It is briefed in the briefs. We do argue that most of the law is field preempted. Okay. So you're rushing on your briefs in that regard. Yes, Your Honor. Okay. And my apologies for giving any other sense. Finally, with respect to one small piece of detainers, Your Honor raised earlier this provision that says that a jailer does not have to comply with the detainer mandate if he assesses documents and determines that the person has lawful status in the United States, and then it mentions as an example of a document that might be offered a Texas driver's license. This is a safety valve in the detainer provision because it's intended to make sure that certain people are released who perhaps shouldn't be held, but it is absolutely and completely conflict preempted. It authorizes local employees to make immigration determinations and then further authorizes and requires state judges to make that same determination when the issue is raised as a defense to prosecution, and that's in SB 4 at 39.07. What prosecution? Jailers can be prosecuted criminally for not complying with the detainer mandate provision. In addition to the— I mean, a jailer—okay, so a jailer looks at so-and-so's driver's license issued from Texas, and he believes this, so he calls ICE, he doesn't call ICE, and then this person is released. And you're saying, again, the state attorney general is going to swoop down and find this jailer or put him in jail. Well, the record reflects, Your Honor, that the governor has talked about bringing the hammer down on county officials that do not follow detainer mandates. So accepting the facts around Your Honor's question as being quite likely, one can raise as a defense, and thus SB 4 requires a state court judge to make an immigration determination as part of the defense to the prosecution of not following a detainer. And the driver's license, and Your Honor's question is absolutely perfect, somebody cannot have lawful immigration status and still hold a valid Texas driver's license. ICE knows that. If somebody is removed and enters illegally, they could still have a valid driver's license or order removed and absconced. This is a person who ICE wants. They've been caught up, brought to jail on some other issue. ICE wants that person and wants that person to be detained, and SB 4 says, no, this is the sort of thing that you should rely on to make an immigration determination and then release that person, an immigration determination and release that person. And so for that reason, Your Honor, it is doubly conflict preempted. Are you saying that if there is an immigration homeland security, ICE, whatever, detainer, and they call the local jail and say, hold this person, we think that he's here illegally without documentation, that the jailer does not have to or is not required to follow that detainer? But with this law, there would be? Yes, Your Honor. That's exactly right. SB 4 carries a mandatory detainer compliance provision. And why would such a requirement be inappropriate if you have a federal official saying, we have probable cause to believe this person is here illegally. Please hold him for us until we can take him over, whatever happens. This is the perfect moment, Your Honor, for me to segue to Mr. Gallant, who is going to talk more about the issues surrounding detainers. And I see my time is up. I'll ask you just one other quick thing. This persecuted jailer who gets prosecuted can't raise the classic immunity defense? No, Your Honor, SB 4 waives immunity in that context. What provision of SB 4 waives immunity? That I do not have. I'm sorry, I missed all this in your brief. All right, thank you. So we'll look it up. Well, before you sit down, tell us about Fourth Amendment standing, because I don't really see how the cities have Fourth Amendment standing. Whose Fourth Amendment rights are being asserted and how can they assert them? The Fourth Amendment rights that are being asserted here, Your Honor, are of individual officers. We have three county sheriffs in El Paso County, Travis County, and we have another in Maverick County as well. We also have individual, so for the Fourth Amendment, we also have individual officials who are leadership of their entities. And they have, under Allen, the allegation and what provides standing is that they are violating their oath of office and they are subject to very substantial fines as a result of that. And if some plaintiffs in the case for any particular claim have standing, then their standing is valid. But explain to me how that plays out as a Fourth Amendment violation. I still don't quite understand how that fits within that amendment. Under Allen, Your Honor, if the individual officer has taken an oath to comply with the Fourth Amendment and, as before, forces the officer to violate his or her oath under threat of very severe sanctions, then there is standing in that situation to assert a Fourth Amendment challenge. It would be the oath not to violate the Fourth Amendment as to individual persons. Is that the point? Yes, Your Honor. Thank you. All right. Good afternoon, Your Honors. May it please the Court. I'd like to address vagueness and preemption and time permitting and also address detainers and take a step back. What I see as the central focus of this case, at least one of the central focuses, is what are local officials on the ground going to be doing, what guidance are they going to get, and how are they going to comply with SB 4? So let me start with vagueness. The law says they may not prohibit or materially limit immigration enforcement. The Solicitor General said, well, our plaintiffs know some of the things that fall within that law because it's in their declarations. That's wrong. The declarations specifically talk about policies that prohibit immigration enforcement. We concede that the word prohibit is not vague. What we're talking about are what can they do short of prohibitions, materially limit. And there is enormous imprecision in that term, and it's combined with the harshest possible penalties on local law enforcement officers. And in addition, there's no qualified immunity in that or good faith exception in that part of the statute dealing with A1, A2, and D3, the non-detainer portions, which is what I'm talking about now. And so this court has been vigilant about not letting local police be charged in 1983 actions without qualified immunity, without good faith exceptions. You have local officials now that are happy to cooperate with ICE. One of our plaintiffs, Sheriff Schmerber in Maverick County, has spent more than 25 years with Border Patrol. He is not against enforcing the immigration laws, but he needs guidance on what the term materially limit means. The state has come in and offered their own construction. A few points about that, Your Honor. Notably, it took them multiple stages of this litigation, multiple briefs to decide on what they actually meant by materially limit. First they said materially limit is when it has an effect on immigration. Then they moved to a purpose test when it's motivated by anti-immigration policies. Now they have sort of a general policy that says if it's not immigration-specific. I think that right there tells you that there's no common understanding of materially limit. And the state has suggested, well, materially limit is used often in other contexts in the law. But as the Supreme Court recently said in Johnson, a vagueness challenge is context-specific. It may be that in other parts of the law it's used and based on the context it's clear. Here it is not clear. And in those other parts of the criminal code or the civil code, sorry, the civil code that Texas has cited, there were no harsh penalties. Here you have local officials who have to make on-the-ground decisions about what they can do, can they limit their officers. They have no guidance, and then they're facing $25,000 a day in personal fines. Why doesn't Salerno apply to this? Your Honor, the Supreme Court in Johnson recently said that if there's no core to the law, then it's vague. You don't have to have in every application. This court has done... Sorry, Your Honor. Go ahead. In Johnson, made absolutely clear that you don't have to have a law that's vague in every single application to strike it down facially. That was Johnson. This court reaffirmed that. In Westbrook, in Women's Medical Center, this court struck down a law on facial grounds, pre-enforcement on vagueness grounds where there's no core. And the State has suggested, well, there could be some clear applications. There are always clear applications at the margin. I mean, why is it not clear to say that this, you know, an entity, let's say your local... We're going back to the poor jailer here, the persecuted jailer. He has to exhibit a pattern or practice that materially limits enforcement of immigration law, such as never inquiring into the immigration status of a person, never sharing information with the federal government, never cooperating. It seems to me when you tie materially limiting to a pattern or practice, we all know it when we see it. And isn't that confirmed by the fact that a number of your sheriffs have said, well, we know we're in violation of this right now? Your Honor, so let me be as absolutely clear as possible on that, both with respect to what our sheriffs have said in the declarations and to those hypotheticals you gave me. Those were all categorical prohibitions. We concede that those fall within the statute. And remember, the statute says prohibit and materially limit. So materially limit has to be something less than prohibit. Prohibit or materially limit. Right. And so you know the materially limit has to be something less than prohibit. So those examples you gave me, as well as the ones in our declaration, our sheriffs are saying we know we can't have a categorical prohibition anymore. But what about if we say immigration is going to be the lowest priority for us, we're going to always prioritize local crimes ahead of that, or we're only going to allow one of our officers to enforce immigration law? You know what? I think both of those are – I personally think both of those are materially limiting because, frankly, the burden placed on the authorities vis-à-vis the immigration laws is pretty darn small. It amounts to making phone calls, which either you or Ms. Prowlis started out your argument by saying they do all the time, and they have been doing all the time. Your Honor, we have declarations from all of these police chiefs and sheriffs in both small cities and major cities saying it's not a small burden. It's not just phone calls. They are asked by ICE all the time to come out and join us in this raid. And so Your Honor suggested that those examples fall within materially limit. The state has said the exact opposite. They have said anything that's based on resource constraints doesn't fall within materially limit. So now we have our sheriffs on the ground making real decisions saying, can I limit my officers from going on this raid? Are you familiar with the policy in Texas where you can inquire of the state attorney general and get an opinion about the status of a law, and those are basically controlling? Your Honor, I don't think that the state can rewrite the statute. And I don't know that it's practical for our sheriffs to call every single day when they want to limit somebody. I think that we're talking about enormous penalties that could personally bankrupt these police and sheriffs. So if I'm sitting there as a city attorney and I say, what do I tell my employees or what can I do? Can I say to them, we don't participate in raids at shelters. We don't participate when it's a raid on a home without criminals. Or immigration is a lower priority than solving local crime. Well, A, there's the possibility of as-applied challenges. B, there's the possibility of individual declaratory actions. C, there's the possibility of asking the state attorney general for a controlling opinion. Your Honor, I think the as-applied, I think the Supreme Court, and frankly in this court in the past, has never said that an individual, especially a local law enforcement officer, has to bet the farm and say, I'm going to do this and I'm going to take my chances in an enforcement action when the penalties are so severe or every time I want to do something on the ground, I'm going to try and get the attorney general on the phone to get an opinion. The ways it comes up are so numerous and there's constantly decisions. If I'm a sheriff, I don't know what I can do. If I'm a city attorney, and I'm frankly not aware of a law like this where the penalties are so harsh on a local law enforcement age. I mean, $25,000 personally, and the state itself cannot come up with a definition, and you yourself, Your Honor, suggested that the definition the state has come up about, you don't have to do things if there's resource constraints, is differing. So right there you know that it's not as easy as the state suggests. And the state, remember, if materially limit is struck out, they still have prohibit. You know, people go to jail all the time for SEC violations about what's a material misrepresentation, and those cases go to juries. I mean, it just seems to me the whole idea of materiality is well established in the law, and it would be very presumptuous of us, given that we're supposed to give deference to state statutes, to just haul off and say the whole idea of materially limits is unconstitutional. I think, Your Honor, a few things about that. In Johnson, the same argument was made. They said, well, look, the terms at issue in Johnson. That was the ACCA, right? Right, that was the Act of Residual Clause. And that was after the Supreme Court itself had tested the law for well over 20 years, right, and just given up. And you're saying that the courts should give up the legislation before even one prosecution has been brought. Your Honor, what I am saying is, well, first of all, Women's Medical Center did do a pre-enforcement facial challenge. That was a decision of this court. So it's absolutely clear this court does it. And when you're talking about local law enforcement getting hit with bankrupting fines, I think to say to them, go take your chances, I don't think that's the way what the Supreme Court is suggesting on that. And remember, in Johnson, the same argument was made. They came to the Supreme Court and said, look, the terms at issue in the ACCA Residual Clause are used in other statutes, so they must be clear, and they weren't struck down there. And what the Supreme Court said very clearly is context is everything. And in this case, it is impossible to figure out what a local sheriff can do. We have given numerous examples, and the state has only come back and said, well, if it's a bona fide resource constraint, then you don't have to do it. Your Honor disagrees with that interpretation, which just shows that it's not us. But even that, can they say we're going to only send one person out a month to help on immigration? Can they make immigration the lowest priority? It's a policy or practice, so they're right there. You're going into beyond material or limiting. No, no, it's prohibit or materially limit a policy or practice. So it's prohibit and materially limit. Your Honor, if I could just turn to preemption for a minute. Let me put it this way. Are you arguing field or conflict? I'm arguing conflict, Your Honor. Okay. Let me address Judge Smith's question. As to what provisions, are you just taking all of them globally? Your Honor, let me start with B3, because I think that's the provision that's most contentious, and that is prohibit or materially limit immigration enforcement with the clause, with the assistance or cooperation of a federal immigration officer. And let me address Judge Smith's question, because I think that gets to the heart of it. Judge Smith asked the other side, are you suggesting it can be unilateral, or does it have to come at a request? And they said a request. Let me just say that that can't be the line. Even assuming SB 4 could be read not to allow unilateral, and it has to come at a request, a request is necessary but not sufficient. It can't possibly be sufficient. And so take, for example, ICE calls our sheriff and says, go out to East Texas and try and find people who are here illegally. We think there's a lot of people in this particular area in East Texas. Or go to this soccer field. We think a lot of people play soccer on Wednesday nights or are here illegally. The local police officer would go out there, and then they would have to use their judgment without training, without any understanding of immigration law. I don't see that hypothetical as coming within the scope of the enforcement assistance provision at all. Right. Well, Your Honor, the reason it does, and this is why I want to be as absolutely clear as possible, the state has offered only one line to understand that provision. If it comes at a request, then it's okay. So anything ICE now requests is okay according to Texas. That's how they are interpreting the provision. And I am suggesting that that can't possibly be. Because then you would have local officers making determinations about whether someone's removable at the soccer field. They would be making arrests. They would be doing interrogation. The mere fact that ICE asks you can't mean you can do everything that Congress wanted you to do after training and supervision under agreement. So it has to have some amount of federal control. And I think the truth is that Texas doesn't want to go there. They want to just draw this bright line for you and say, as long as ICE calls and requests, that's sufficient. But once you know that there has to be some federal control, how much federal control is a problem? A law says as reasonable or necessary. So including providing assistance, and that's, say, with federal control, I just think your hypothetical is totally off-base. Well, Your Honor, I'm reacting to Texas trying to give you an interpretation of the provision. And they are simply drawing the line that if there's a request, and that's how they answered Judge Smith. So it has to be that federal government's going to be in control. Now, here's the problem. Exactly what that means, how much control, is a tricky question. Judge Smith asked the follow-up question, which is also critical. Well, prior to that, wasn't there a question about how much control, what was preempted and what wasn't? And that's exactly the right question. Because under that proviso, G10B of 1357, there was ambiguity. Justice Kennedy in Arizona specifically said it was an ambiguous provision. The reason it didn't matter then is because Congress imposed no penalties. So you're a sheriff sitting there, and ICE calls you and says, hey, can you go to the soccer field and do this? If you're not sure, you just decline. They can't go unilaterally. They're getting the call. That's what I'm saying. They're getting the call. I don't see that. That is, when they get on that soccer field, they are acting unilaterally if they're supposed to be making the call. That's exactly right, Your Honor. Well? Because Texas is only saying the call is sufficient. No, they're not saying that. Well, Your Honor. Well, we'll let them answer. Yes. And so on reply, if they want to give you a definition of what the federal government has to do beyond making the call, that would be great. But what I'm suggesting in response to Judge Smith's question is, then how much control is a difficult question for the sheriff? Well, what if they're there but not supervising? All those kinds of things. Prior to that, Judge Smith, it didn't matter because Congress didn't impose any penalties. You got that call and said, can you help us under this savings proviso of 1357GB10? You declined if you thought you were anywhere near the line of preempted activity. That's not, I mean, I really think you're, I really disagree with your interpretation of what they're saying in the Arizona opinion. But, Your Honor, in the Arizona opinion? Well, the Arizona opinion didn't address any of these issues. It addressed only one issue, and that was the inquiry. I mean, as related to what, the only provision they upheld. But using Arizona as the basis for saying that this G10B business was ambiguous. But that's what Justice Kennedy specifically said when he struck down, you can't do unilateral arrests. Unilateral? Exactly. And what he said is, that goes far beyond the line. Where the line is is ambiguous. It never mattered before. Because the sheriff would simply decline to cooperate with ICE if he thought he was getting near preempted activity. If they were asking him to do something that was preempted. Now it matters because the sheriff declines, SB 4 hits him with those enormous penalties. Congress never wanted those penalties. Congress wanted a cooperative scheme, and they wanted localities to have their own discretion. And that's why they didn't impose penalties. This is a sea change now where every ambiguous decision, everything that's unclear before, now becomes fraught. Because the individual law enforcement agent is going to be hit with these enormous, enormous penalties or removed from office. And so we do not know how to advise them. What materially limits they can place on it. When they have to cooperate or don't cooperate. Now if Texas wants to stand up here on reply and say, not only does, now change their answer to Judge Smith and say, not only does there have to be a call from ICE, but ICE has to be involved to this extent and they're going to spell it out. They can't do that, and there's no way. And that's why Congress wouldn't even impose penalties. Congress would have never passed a statute that said, every time you make a mistake about what's preempted, we're going to hit you with, we're going to clobber you with debilitating fines. That's not the way the statute was set up. If I could just. You have run way over. I'm sorry, Your Honor. Thank you. Okay. Thank you. Mr. Keller. I think it's helpful to step back, and I'd like to make two overarching points to begin with. First of all, we're here on a facial pre-enforcement challenge, and so Salerno does apply. And you heard various hypotheticals that are marginal applications, some of which would not even be covered by SB 4. That cannot possibly doom SB 4 as a facial matter. And second of all, the scope of the arguments that the plaintiffs are making on the Fourth Amendment and preemption is sweeping. It would bar even the federal government from making detention arrests for immigration. And even on the preemption side, it would prohibit even the local ad hoc voluntary compliance that they're saying has existed for some time up to here. And so the sea change would be adopting the plaintiff's position, which would also require you to contradict what the state panel ruled on and create various circuit splits in doing so. The facial vagueness standard, and again, they're ignoring Gonzalez-Vangori, this court-signed bank opinion from last term that interpreted Johnson. It said that a law is only facially vague if there's simply no court of the law. And their declarations, yes, there are some of their declarations that talk about prohibit and go to prohibit, but not all of them. For instance, Travis County had a policy that was selective compliance with ICE detainers. They would only comply with ICE detainer requests that were for certain predicate crimes. That is not a categorical prohibition. That is a material limit upon immigration enforcement. On the free speech issue, if I can return to that, and Judge Jones, you asked about the First Amendment issue and savings construction. Page 43, we cite Virginia v. American Booksellers. This is a 1988 Supreme Court case. Supreme Court there said, quote, it has long been a tenant of First Amendment law. In determining a facial challenge to a statute, if it be readily susceptible to a narrowing construction, that would make it constitutional. It will be upheld. And so the skilling rule, the Virginia v. American Booksellers rule of adopting a narrow construction applies also in the First Amendment context. And so the reasonable construction that we have offered to limit indoors so it's not sweeping in all sorts of private citizen speech makes that provision valid. What about materially limits? You're saying, what about their hypotheticals? Why don't you be a little more specific about some of their hypotheticals about, shall we go on these raids of houses that have aliens? Shall we respond to a vague phone call? That sort of thing. I'd be happy to. And I'd like to highlight pages 38 and 39 of our brief. Because you don't need to ask the Texas Attorney General for an opinion on this. We have already taken a position in this litigation. There are two key parameters that plaintiffs are ignoring here. First of all, a material limit is one that requires a logical connection between the policy and immigration enforcement. And this is where we admit that if something is an actual bona fide resource constraint, if it is an immigration neutral policy about overtime or patrolling or anything like that, that would not qualify as a material limit. It would not have the substantial connections as necessary under the qualifying term material. And second, also to have a material limit, to place a limit on a power, you have to already possess that power. So a policy that says we're not going to unilaterally arrest for federal immigration crimes, that is perfectly fine because that power is already preempted. So there's no limit being placed upon that. Regardless, even though we have offered those two reasonable constructions of the statute, we are here on a facial pre-enforcement posture. And so even if there were to be some hypothetical out there that they could raise an as-applied challenge for down the road, when we're talking about the context of a facial challenge, the issue is, is there no core? Here it is clear that this would block policies that not only categorically prohibit but also material limit or impede immigration enforcement. At base, this is a dispute with the localities wanting to override the state legislature's sovereign prerogative of how to exercise its own state police power. This is not a regulation of aliens like two of the provisions found preempted in Arizona. And this is not a unilateral arrest power. And my friend on the other side says that the Arizona opinion said that G10B was ambiguous. But Arizona itself acknowledged three different examples where you could have enforcement cooperation without a formal 1357G agreement, joint task force, operational support and executing a warrant, and access to detainees held in state facilities, which would implicate B4 here. And all of those provisions were valid. And the Obama administration took that position and the Supreme Court quoted that position. Here, what we're asking the court to recognize is the state can direct its localities how to cooperate with the federal... Are you saying, for instance, that if Sheriff Travis County says something about we're not going to participate in joint task forces, then that materially limits, you know, or any joint task force that occurs on a Saturday or Sunday, you know, when presumably people are going to be relaxing and have their hair down, that that would be materially limiting and that's not even a problem? Yes, it would be covered by SB4. Travis County could not have a policy that says we are not going to help federal immigration officials when they've asked for that joint task force. So, I mean, at the minimum, at the minimum, the things that the Supreme Court described in the Arizona case would, if coming within the strictures of SB4, have to be upheld. They're not conflict preempted. Absolutely. And those, by no means, are an exhaustive list of three examples. There would be many other examples, immigration status inquiries, information sharing, and, indeed, ICE detainer requests. I mean, isn't it correct also that the Attorney General's opinion writing power can add to this explication of this statute? Absolutely. And, indeed, the reasonable constructions we have given here today give ample guidance. But if there's any possible application on the margins as applied, challenges can be brought. And, also, even on the ICE detainer component, SB4 says the state will defend and indemnify officials for complying with SB4's ICE detainer mandate. All right. Thank you. We have your argument. Thank you very much.